IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. ) Criminal Action No.:
) 4:15cr83
DYLAN ALLEN JEFFRIES, )
)
Defendant. )

TRANSCRIPT OF PROCEEDINGS

(Sentencing)

Newport News, Virginia
June 24, 2016

BEFORE: THE HONORABLE MARK S. DAVIS
United States District Judge

Appearances:

OFFICE OF THE UNITED STATES ATTORNEY
By: KAITLIN COURTNEY GRATTON, ESQUIRE
Counsel for the United States

LAW OFFICE OF CHAD G. DORSK
By: CHAD GRAY DORSK, ESQUIRE
Counsel for Defendant

The Defendant appearing in person.

P R O C E E D I N G S

(Proceedings commenced at 10:02 a.m. as follows:)

COURTROOM DEPUTY CLERK: In Case No. 2:15cr83, United States of America v. Dylan Allen Jeffries.

Ms. Gratton, is the government ready to proceed?

MS. GRATTON: The government's ready. Good morning, Your Honor.

THE COURT: Good morning, Ms. Gratton.

COURTROOM DEPUTY CLERK: Mr. Dorsk, is the defendant ready to proceed?

MR. DORSK: Yes, ma'am. Good morning, Your Honor.

THE COURT: Good morning, Mr. Dorsk.

Madam Clerk, can I speak to you for a second?

COURTROOM DEPUTY CLERK: Yes, sir.

(Court and courtroom deputy conferred.)

THE COURT: All right. Now, counsel, of course we were previously here, and a couple issues arose during the sentencing that caused the Court to continue the sentencing so that you all could look further at the evidence and discuss amongst yourselves how you wanted to proceed. When we were here for the prior sentencing hearing, we had testimony from Agent Call to the effect that when the statement of Jane Doe 1 was taken, that it may have been recorded. And the government

indicated it had not been aware that there may have been a recording, and obviously if the government wasn't aware, the defense was not aware. And the government pointed out that a summary of that interview of Jane Doe 1 had, in fact, been provided to the defense. And the issue on that was that we didn't know whether the summary accurately reflected the interview; if there was a recording of it to compare it to check that. And so I asked the parties to investigate that further, because I thought it was important that, before we proceeded with the sentencing, the defendant have the opportunity, if there was a recording of the interview of Jane Doe 1, to listen to and/or observe the interview. I asked that a joint status report be filed addressing that issue. And that was the first issue that came up in the prior sentencing hearing that caused me to want to continue the matter.

And the second issue that came up that caused me to want to continue the matter was the question involving the objection made by Mr. Dorsk. The sentencing guidelines are something that the Court has to accurately calculate. They're not binding, but the Court has to accurately calculate them. And as we discussed at some length in the prior sentencing hearing, the statutory range for the sentencing on Count 3 to which the defendant pled guilty; that is, coercion or enticement, the statutory range is 10 years, mandatory minimum -- or I should say a minimum of 10 years of imprisonment

and a maximum of lifetime. And when we came in to the sentencing, the guideline range as calculated based on the existing presentence report was an offense level 36 and a criminal history category I, and that resulted in an advisory sentencing guidelines range of 188 to 235 months. That guideline range was calculated based on, in part, an eight-level enhancement that flowed from the conduct involving a minor who had not yet attained the age of 12, and that was guideline 2G1.3(b)(5). And the probation officer had included that enhancement which resulted in an increase in the sentencing range based on statements made by Jane Doe 1 when she was interviewed in the interview that Agent Call told us about. And during that interview, Jane Doe 1 had said that she had, among other things, had sent photographs of herself in an unclothed condition to the defendant when she was 10 or 11 years old.

The defendant, when we started off the hearing, objected -- well, they objected prior to the hearing, but when we came to the hearing the objection made by the defendant was essentially that there were FaceBook chats between the defendant and Jane Doe 1 -- and I should mention that Jane Doe 1, at least according to the testimony of Agent Call, Jane Doe 1 had said that these communications, and I believe photographs that she said had been sent by her, unclothed, to the defendant when she was 10 or 11, took place over FaceBook. That's my recollection, at least, of the testimony. And so we had a discussion about

whether that statement from Jane Doe 1, which was in the presentence report and which formed the basis for giving the defendant an eight-level enhancement for engaging in conduct with a minor who had not yet attained the age of 12, whether that statement was sufficiently reliable such that it should be included in the presentence report. If it was sufficiently reliable that it should be included, then the burden of challenging it and presenting evidence shifted; that is, the burden of going forward shifted to the defendant. If, however, the statement included in the presentence report from Jane Doe 1 lacked sufficient indicia of reliability, the government would have had the burden of going forward to show that the statement was a credible statement. The defense argued that if you looked at the FaceBook chats from July of 2015, I believe it was -- and these, I should note -- I have the original exhibits, Madam Clerk?

COURTROOM DEPUTY CLERK: Yes, sir.

THE COURT: Government's Exhibit 1 and Defendant's Exhibit 1, and it's 2014, excuse me. That these -- I have -- Government's Exhibit 1 are chats of July 5, 2014, and Defendant's Exhibit 1 are FaceBook chats of July 15, 2014. And so the defense pointed to this chat history that we have here and argued that it appeared from the chat history that the defendant and Jane Doe 1 were -- let me say it this way: That the interactions were characteristic of two people who were

getting to know each other and perhaps testing the boundaries of their interactions -- that's the best I know to say it -- but that they were not consistent with two people who had had interactions a year or two before when Jane Doe 1 would have been under the age of 12 that had, at that tender age, reached the point of Jane Doe 1 actually transmitting to the defendant unclothed photographs of herself.

And so as the evidence developed at the hearing, it appeared that the government had produced the results of its subpoenas to FaceBook for the chat histories of both the defendant and Jane Doe 1, and some of those chats had been deleted. And where there was a deletion, the government suggested it may be the case that the history would still be present showing the recipient, the author, the Sent line and then, on the deleted line, an indication that it had been deleted but that the body of the chat would no longer be present.

It appeared to me that it was an open question. We didn't have all of those subpoena responses before us, and it appeared to be an open question about whether there was an actual piece of evidence in the form of a chat history, whether it had been deleted or not, that confirmed that the defendant and Jane Doe 1 had, in fact, had FaceBook chats when she was 10 or 11 years old. And so I asked the parties to take a look at that. And that was the second issue that I wanted you all to

look at and report back to me on. The reason for that was the defendant was challenging whether the statement made by Jane Doe 1; to wit, I sent unclothed photos of myself to the defendant when I was 10 or 11 years old, was a statement that could be corroborated in any way. The government had argued that the specifics of that statement, that it wasn't a mere statement "I sent unclothe photos," it was a statement tied to age, a year, what the photo was of, and there were specifics. And the government took the position that the specifics within the statement given by Jane Doe 1 were sufficient to lend credibility to it and that it should remain in the presentence report and that the burden of going forward to challenge it and present evidence to challenge it should shift to the defendant. While the defendant took the position the statement by itself does not have sufficient credibility to stand on its own in the presentence report, and the government should come forward with evidence to bolster it. In my view, one of the pieces of evidence, it seemed to me, that would help me decide whether the statement from Jane Doe 1 that she sent photos when she was 10 or 11 years old had indicia of reliability would potentially be a FaceBook chat when she was 10 or 11 years old between herself and the defendant. Even if the content had been deleted, it would at least show that there was such contact. So that was where we were.

Now, prior to the continuation I had gotten all the

way to the point of making a ruling on the objection and making a ruling on the -- or reciting the guideline range. I of course had already, because this guilty plea came to me through the magistrate judge, I had to accept the plea agreement and make a finding of guilt. I had already accepted the plea agreement and made the finding of guilt and ruled on the objection, but then I said I was going to hold all my ruling in abeyance and wait to receive the joint status report, hoping that by then you all would have reviewed any recording of the statement of Jane Doe 1, if there was any, and that you would have had a chance to look at the FaceBook chats to determine whether there was any record of a chat, even if it had no, even if the body of the chat was absent, whether there was any evidence that there was a chat when Jane Doe 1 was 10 or 11 between herself and the defendant.

You all filed a joint status report, Document 33, on May 25th, 2016, and you say that the government did obtain and review an approximately 36-minute video recording of Jane Doe 1's August 25, 2015 interview; that is, the interview at which Agent Call was present and taking notes, if I recall correctly. And you went on to say, "Although the video depicts the participants of the interview, it does not include any functional audio recording of their discussion. This video has been made available to defense counsel." And that statement is consistent with Agent Call's testimony at the hearing to the

effect that we were concerned about the recording, and so I took notes. And so that's the additional evidence with respect to one of my concerns that caused me to continue the hearing.

The joint status report goes on to say the following: "The FaceBook records obtained for the defendant's account in the name Dylan Jeffries include content from March 11, 2015, through April 17, 2015. These records include deleted messages between the defendant and Jane Doe 1 within that period. The FaceBook records for Jane Doe 1's two accounts include content from September 10, 2012 through April 17, 2015 and from September 2, 2014 through April 17, 2015 respectively. These records include deleted messages beginning in July of 2014."

So my interpretation of this, if I understand correctly, is that on Jane Doe 1's two accounts, one of the accounts, when you went back and looked at the FaceBook records received in response to the government's subpoena, that on one of the accounts there is content from September, 10, 2012 at which time Jane Doe 1 would have been below 12 years old. So September 10, 2012 through April 17, 2015 on that account. And it does not say whether the content during that time period is between the defendant and Jane Doe 1. So I'm left without clarity on that issue. And it doesn't really tell me whether or not those chats from September 10, 2012 to April 17, 2015 are deleted, have deleted bodies or deleted messages. It just doesn't tell me any more.

Now, I go over all of that so you all know what I'm thinking and where I am here. And I think both counsel, you all have appeared before me long enough to know that I like as much clarity as possible. And part of the reason that I like clarity is I don't want to be here in five years or three years or two years having somebody file a motion saying, well, Judge, you should have done this or that, or Judge, what was the state of the evidence? It's an obvious question, it should have been inquired into. And so that's, I think, where I am. I don't know where you all are. But I am happy to hear from you about any of this and how you want to proceed. You may have reached agreement amongst yourselves. But Ms. Gratton, do you want to address it first, or do you think Mr. Dorsk should?

MS. GRATTON: I'd be happy to address it, Your Honor.

THE COURT: All right.

MS. GRATTON: On the Court's question regarding the joint status report filed on May 25th, Paragraphs 2 through 4 of that reflect that the defendant had two accounts, neither of which did the records obtained -- neither of the records obtained for those accounts dated back to 2013. The earliest records for the defendant's FaceBook accounts were January 1st, 2014 on the account described in Paragraph 2.

THE COURT: Meaning that there was no record at all? Not even some deleted message without a message, but still a record of a chat. So nothing?

MS. GRATTON: Yes. And if I may explain that to the Court if the Court wishes -- Agent Call is here -- but FaceBook, when a search warrant is submitted for the contents of an account requires the requesting party to submit a date range. And as Agent Call's testimony reflected at the prior sentencing, at the time the defendant's FaceBook records were requested, she was aware of the complaint related to Jane Doe 2. The conduct related to Jane Doe 1 was discovered through review of the records received from the defendant's FaceBook account. So at that time the dates that were submitted, it was within a year prior to the known conduct, which was January 1st, 2014. And so that's not to say that no records exist, but the government is not in any possession of any records prior to January 1st, 2014 related to the defendant's FaceBook.

THE COURT: So that was the range? You had asked for records far back at January 1, 2014?

MS. GRATTON: Yes.

THE COURT: Okay.

MS. GRATTON: Which is what we've had. And all of those have been provided to defense in discovery. So with respect to what if any content exists in the records related to that account that the government does not possess, the government just does not have those records.

THE COURT: For the defendant.

MS. GRATTON: For the defendant's account.

THE COURT: Okay.

MS. GRATTON: The government did receive records for Jane Doe. She also had two FaceBook accounts. One of those accounts did include records dating back to September 10th, 2012, generally. Just content generally. I think the parties would agree that Government's Exhibit 1 reflects the first substantive exchange for which content was identified between Jane Doe 1 and the defendant. So the July 5th, 2014 exchange submitted as Government's Exhibit 1 at the prior hearing. That's the first content we have between the two.

THE COURT: Content meaning a message?

MS. GRATTON: Messages that weren't deleted. So the last line in Paragraph 4 reflects that, similarly, the earliest deleted messages found in that account belonging to Jane Doe 1 also date from July 2014, and that should have said deleted messages I believe with the defendant. Unless defense counsel's review...

THE COURT: Okay. So there is absolutely no evidence in the FaceBook chats subpoenaed regarding Jane Doe 1 of any interaction between the defendant and Jane Doe 1 while she was under the age of 12 --

MS. GRATTON: That's correct.

THE COURT: -- is that right? Okay.

MS. GRATTON: Yes. For the two accounts that the government identified, only one of which dated back to the

relevant period, there was no content or deleted messages prior to July, 2014. And although the government maintains its position with respect to the specificity of the statement provided by Jane Doe 1, in light of the Court's prior ruling and the concerns expressed related to the FaceBook account, the government's not asking the Court to revisit its ruling on the objection from the prior sentencing.

THE COURT: Okay. Well, I held my ruling in abeyance so that I could have the benefit of all of this. But it was the case, wasn't it, that Agent Call said Jane Doe 1 reported that she had sent her photographs of her unclothed when she was 10 or 11 years old via FaceBook?

MS. GRATTON: Yes. That was the testimony. And that is the statement in the summary of the interview.

THE COURT: All right. So in my view, that bolsters the ruling that I had made, at least as a preliminary matter, sustaining the defendant's objection. And I will remain of the same view then, that the objection is sustained in light of that.

MS. GRATTON: Thank you, Your Honor.

THE COURT: All right. Thank you, Ms. Gratton.

So Mr. Dorsk, I assume you don't want to disagree with that, since I've sustained your objection?

MR. DORSK: That is correct. Thank you, Judge.

THE COURT: Okay. So where that leaves us is the

guilty plea has been accepted, I've accepted the plea agreement, I've made a finding of guilt, and with the objection to the eight-level enhancement for an offense involving a minor underage 12 having been sustained, we are at the point of restating the ranges and moving on to any additional evidence or argument.

The statutory range, as I said -- and so let me say this: The objection having been sustained, I'd ask the probation officer to make the presentence report reflect the fact that I've sustained the objection and make that annotation on the presentence report.

I'll adopt the factual statements contained in the presentence report as the Court's findings of fact. And with that, the statutory range established by Congress and the President for the count of which the defendant has been found guilty is a mandatory minimum of 10 years imprisonment and a maximum of lifetime imprisonment.

As for supervised release, because defendant was convicted under 18 United States Code Section 2242, Count 3 includes a period of supervision of at least five years and a maximum of lifetime supervision.

Ms. Gratton, do you agree that that is correct?

MS. GRATTON: I do, Your Honor.

THE COURT: Do you, Mr. Dorsk?

MR. DORSK: Yes, Your Honor.

THE COURT: And I will say this with respect to supervision. It's 18 U.S.C. 3583(k) that specifically provides for that range.

With the rulings made by the Court on the sentencing guidelines and the objection, it appears that the advisory sentencing guidelines range in this matter would now be a 29, and a I for the criminal history category. So an offense level 29 and a criminal history I, with a resulting range for the sentencing guidelines being 87 to 108 months. However, because the mandatory minimum established by statute is 120 months, there is a restricted guideline range of 120 months.

Ms. Gratton, do you agree that I've accurately stated -- calculated and stated the guideline range?

MS. GRATTON: Yes, in light of the Court's ruling on the objection.

THE COURT: Mr. Dorsk, do you?

MR. DORSK: Yes, Your Honor, I agree.

THE COURT: All right. Just one housekeeping matter for each of you all. These exhibits have the names, Jane Doe 1 names, so you all will provide redacted versions of these for us, Ms. Gratton?

MS. GRATTON: Yes, Your Honor. The government submitted a redacted version in advance of the hearing.

THE COURT: For the Government Exhibit 1?

MS. GRATTON: Yes, Your Honor.

THE COURT: Okay. Mr. Dorsk?

MR. DORSK: Your Honor, I will do the same once I see which Bates stamps they are, because I brought a little bit of a range. Maybe I could do that after the hearing?

THE COURT: All right. So we'll do that and that will be taken care of.

Now, Ms. Gratton, is the government going to have any additional evidence?

MS. GRATTON: No additional evidence, Your Honor, just argument.

THE COURT: Mr. Dorsk, any additional evidence?

MR. DORSK: No, sir.

THE COURT: All right. I'll be happy to hear your argument then, Ms. Gratton.

MS. GRATTON: Thank you, Your Honor.

The government would rely primarily on the arguments as articulated in its position paper and would request that the Court sentence the defendant at the restricted advisory guideline range of 120 months as sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in Section 3553(a).

The government reviewed those purposes at length in its position paper, but would like to make a few additional comments for the Court's consideration.

In response to the notion that, you know, this was

fantasy and that the defendant never acted out on the messages or the descriptions of these desired sexual encounters with Jane Does 1 and 2, the government would note the Fourth Circuit's 2012 opinion in Fugit that recognizes that the statute at issue here, 2422(b), criminalizes the intentional attempt to achieve a mental state within the minor regardless of the intention to actually consummate the sexual activity; that is, the primary evil that Congress, in enacting this statute, was attempting to avert was the psychological sexualization of children. And we live in a world today in a digital age where children are exposed to many things probably much earlier than they used to be. But in that context, we as adults in this society have a responsibility to protect our children from influences such as the very ones that we see here as described in the statement of facts and the PSR. The fact that children can and may be exposed to things that they weren't some years ago or before the advent of the Internet is not an excuse for adults to act on or exploit that level of access for their own purposes, and specifically their own sexual gratification, which is exactly what we see here. And so the sentence that the Court imposes in this case should recognize that. Should recognize that as a member of this society, and frankly as a member of one of the victim's families, this defendant had a responsibility not to engage in this conduct, and that the conduct in which he did engage is serious. So serious that Congress has not only

proscribed it, but has set forth a statutory mandatory minimum penalty applicable to those who engage in it.

And in light of all that -- and the fact that Jane Does 1 and 2 do not appear to have been the defendant's first victims. The hard drive recovered from his home included images of young girls dating back to 2010 in various stages of undress, including, I believe it was approximately 22 images and three videos that qualified as child pornography under the statute.

The defendant acknowledged that he obtained some of these images in the same way that he appears to have been attempting to obtain images from Jane Does 1 and 2; that is, through FaceBook messages and email messages with the girls depicted in those images. And while he acknowledged that some of the girls were 17 and younger back in 2010 when the defendant himself was, I believe about 20 years old, fast-forward five years, and the defendant is now talking to 12- and 13-year-olds. And so this is not a case where the defendant is mature and growing up and moving away from this conduct, it appears that as time has passed his conduct has only gotten more serious, from the government's perspective.

So in light of the need for the sentence to recognize the seriousness -- nature and seriousness of the offense, to accomplish needed deterrence, to protect the public from future crimes of this defendant, the government's requesting a sentence at the restricted guideline range and statutory minimum penalty

of 120 months.

THE COURT: Thank you, Ms. Gratton.

Mr. Dorsk?

I don't need any comments from the gallery, and if I hear any more, you'll be taken out.

UNIDENTIFIED SPEAKER: I apologize, Your Honor.

MR. DORSK: Good morning, Your Honor.

THE COURT: Good morning.

MR. DORSK: Thank you for your patience in this case. I know that we've come back a couple of times now, and the Court has been very diligent, very meticulous. So thank you for taking your time with this case, giving due consideration to my client and his rights. It is greatly appreciated. So thank you for that.

I do not disagree with what the government is requesting, which is the statutory marine minimum; however, of course the Court already knows this, would there not be a statutory minimum, the guideline range would be 87 to 108 months.

I would just like to discuss my client for a moment. He has taken responsibility for his actions. He's still a young man. He understands the gravity of his offense and the hardship that he's put his family through. His family is here in the gallery today. They have been very supportive of him. He comes from a good family. They're exceptionally caring and supportive

of him. So no doubt when he is released from incarceration, he will have a great deal of support within his family in the community. Hopefully he will be able to continue his studies. He was attending class, he was enrolled at ODU at the time the search warrants were executed. He has a long work history.

He has a -- he's a category I. He has a prior marihuana, first offender, that was dismissed. That was at the age of 19. He appears to have conducted himself in the community by not receiving any other criminal convictions. This criminal conviction is certainly a wake-up call for him. He understands that his behavior was wrong, and I've already stated that, but he has sought out psychological counseling. He was going to therapy during the time that this investigation was going on, so he recognizes that he had some issues and he wants to seek treatment in the future. He has, once again, a lot of people that care about him.

We would just ask the Court to take into consideration the presentence report and all the 3553(a) factors.

Thank you, Judge.

THE COURT: All right. If there's nothing else, Mr. Dorsk, from the government, you can remain there.

MS. GRATTON: Nothing further from the government.

THE COURT: All right. Mr. Jeffries, would you step to the podium?

Mr. Jeffries, you have the right to make a statement.

You don't have to, it's up to you, but if you want to make a statement, this is your last opportunity to do so. Do you wish to?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

THE DEFENDANT: I just wanted to state that I am deeply sorry for what has happened. I feel like a complete idiot for getting myself into this situation. I hate that I have involved everyone that I've involved in this. I just wanted to state that I am not the person the government is trying to make me out to be.

That's all I have to say, Your Honor.

THE COURT: All right. Thank you, Mr. Jeffries.

Mr. Dorsk, is there any reason that sentencing should not take place at this time?

MR. DORSK: No, sir, there is not.

THE COURT: Before sentencing, I will review the statutory sentencing factors. Congress and the President have said that judges are required to review these factors before imposing a sentence. I don't have to talk about all of them, but I'll talk about several of them. And the factors are designed to ensure that the sentence that is imposed is a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing. The Court has considered all of them.

I've considered all the defendant's and the government's arguments regarding the guideline calculation and also the request for a specific sentence.

We begin with the presentence report. Defendant, of course, is before the Court having pled guilty to coercion or enticement, which was Count 3 of the indictment.

Defendant is 26 years old.

The offense conduct to which the defendant stipulated was accurate reflects that the defendant maintained a FaceBook account from at least January of 2014 in the name of Dylan Jeffries. And that -- Dylan Allen Jeffries. And it had an associated Internet address stated here. And then from April 29, 2015 he maintained a second FaceBook account in the name of Dylan Jeffries with a different Internet address. On January 30, 2015, Newport News police received a complaint from a parent in reference to inappropriate messages sent to her then-13-year-old daughter, Jane Doe 2, via FaceBook by an adult male later determined to be the defendant. The parent provided copies of these messages, which were sexual in nature, and included graphic descriptions of proposed sexual encounters between the two. The messages also included repeated requests for images of Jane Doe 2.

Newport News police obtained state search warrants for the FaceBook accounts of Jane Doe 2 and the defendant. Review of these accounts identified messages of a sexual nature between

the two in January and February 2015. Review of the defendant's FaceBook accounts also identified messages of a sexual nature between the defendant and another girl, later determined to be his now-13-year-old relative, Jane Doe 1.

In the FaceBook messages with Jane Doe 1, the defendant graphically described proposed sexual encounters between the two, suggested that Jane Doe 1 lose her virginity with him, and expressed frustration at his inability to engage in sexual activity with Jane Doe 1 during a recent visit. In addition to such discussions, these messages included requests for a photograph of Jane Doe 1 in nothing but her cowboy boots, and a video of Jane Doe 1 masturbating.

Immediately following this latter request, the defendant sent Jane Doe 1 a FaceBook message including a photograph of an adult male holding his exposed and erect penis. The defendant's FaceBook messages with Jane Doe 1 also included discussions of Jane Doe 1's approaching 13th birthday and later a shared countdown to her birthday in April of 2015.

The FBI began investigating the defendant's online communications. Task Force Officer Call obtained search warrants for defendant's second FaceBook account and for Jane Doe 1's FaceBook account. Review of the accounts identified the same and additional messages between the defendant and Jane Doe 1. The messages occurred over a period of several months in early 2015 and included numerous sexually graphic conversations.

With respect to Count 2, on February 9, 2015, the defendant exchanged several FaceBook messages with Jane Doe 1 in which he graphically described a proposed sexual encounter between the two, including acts of genital-to-genital and oral-to-genital sexual intercourse. Specifically, the defendant told Jane Doe 1 that he wanted to be inside of her, that he wanted her in her cowboy boots on top of him, bouncing up and down. He then told her that he would pull out and come all over that cute young face of yours and let her lick the rest off of him.

With respect to Count 3, on April 7, 2015, the defendant again exchanged several FaceBook messages with Jane Doe 1 in which he again described a proposed sexual encounter between the two. In this exchange, the defendant described himself as a nymphomaniac and told Jane Doe 1 that "The only way to explain is to show you, LOL."

After expressing concern that Jane Doe 1 would lose interest in him, the defendant described an act of genital-to-genital sexual intercourse between the two. Specifically, the defendant told Jane Doe 1 that when her naked body is in his hands, that she would be completely exposed and in his care. He continued, "Teaching you things about your body, giving you orgasms so intense you start to fall in love, LOL, all while hugging you tight and kissing you all over."

When Jane Doe 1 said that he might also tickle her,

the defendant responded, "You're not going to be thinking about tickling when my d-i-c-k starts to push up into you, LOL."

Those are the agreed facts that the defendant agreed to and that the government agreed to that they were accurate. Those were the facts of the case.

The government has already referred to the fact that the FBI served an administrative subpoena on Cox Communications for information related to the IP address associated with defendant's FaceBook accounts, and the customer was identified as the defendant's sister with whom he resided.

A federal search warrant was lawfully obtained for the defendant's bedroom in his sister's home. The search warrant was executed on May 5th, 2015, and recovered electronic devices, including a hard disk drive. The hard disk drive was found to contain several folders labeled with different female names. In each folder were images, and in at least one folder, videos of different girls in various stages of undress and engaged in various sexual acts. At least two of the girls depicted appeared to be minors.

During an interview at the time of the search, the defendant initially denied in engaging in online communications with underage girls; however, he later acknowledged speaking with Jane Does 1 and 2, and that he had an external hard drive containing pornography. The defendant identified each of the girls depicted on that hard drive and described the

circumstances under which he had received of them, including via FaceBook and email messages.

The defendant acknowledged that the girls depicted on the hard drive were 17 years old and younger at the time the images and videos were created and that the images dated back to 2010.

A computer forensics expert conducted a forensic examination of the electronic devices, identifying multiple pictures and movies, all referenced in Paragraph 14.

The defendant was interviewed by the probation office for this presentence report. He acknowledged that the statement of facts is accurate and that he accepts responsibility for his actions. He further admitted that it was wrong and he needs to grow up and move forward with his life, and expressed a desire to continue psychotherapy treatment once he is released from imprisonment.

The Court is required by Factor No. 1 to consider the nature and circumstances of the offense, and those, in summary are the nature and circumstances of the offense.

The Court is also required to consider the defendant's history and characteristics. Defendant was born in 1989 in Alleghany County, Virginia, the younger of two children born to the union of his parents. He maintains a good relationship with both parents, who remain supportive of him. The defendant was residing with his sister here.

The defendant described that he loved the way he grew up, with loving parents rearing him in a working household, and he described that in very positive terms. Defendant said that he was instilled with good values at home and he recalls growing up with good values and playing sports. All of his basic needs were met. There were no domestic disturbances reported.

Defendant is a lifetime resident of Virginia. First Clinton Forge, and then relocating here.

His overall health as described by him is fair. He suffers from back pain since an earlier age.

Defendant has no history of mental or emotional problems and no history of treatment.

During the investigation for the instant offense, defendant began treatment at Christian Psychotherapy Services in Chesapeake, reported attending treatment on a weekly basis, though I don't know that we have records confirming that, but that was the report. The sister, defendant's sister reported he received treatment at a different location, and perhaps that's the reason.

It does appear that the defendant received some medication while he was beginning college for Attention Deficit Disorder.

With respect to substance abuse, the defendant reported that he started smoking marihuana at age 16. He admitted to smoking one gram on a daily basis, and he stopped

smoking in 2015 when he became aware of the investigation for his instant offense.

The defendant graduated from Alleghany County High School. He obtained a certificate in computer systems technology from Jackson River Technical Center. He attended Roanoke College for a period of time, and then he completed an associate's degree in history at Liberty Online during 2011 and 2012. Also attended Devin Lancaster Community College for classes and he attended ODU for a period of time in 2014 and '15, returning in 2015 to TCC, attempting an associate's degree in horticulture before he was arrested. He has been employed at Kroger in 2014 and '15, and voluntarily quit to return to school. He worked at MacArthur Mall for a period of time, and he worked at Mohawk Industries in Glasgow for a period of time, 2010 to 2012.

The Court received several very positive letters from the defendant's family, including photographs. And the Court also has a report from Dr. Fanning at Psychological Services of Virginia referencing the defendant and his treatment. The defendant reported, there, feeling remorse to her during his treatment and being in a dark place while the conversations occurred. He said he was beginning now the long and difficult process of dealing with both his anxiety and depression. He was willing to take responsibility for his decisions.

I think I may have talked about this a bit at the last

hearing, but there's also a letter that has been submitted here from the defendant's father that goes into some detail, which I think frankly found helpful.

Madam Clerk?

(Court and courtroom deputy conferred.)

THE COURT: So the letters, although they will be attached to the presentence report, are not public record, and I say that in part because of some of the specific discussions in the letters that might help to identify the victims. I have other letters that say very nice things about the defendant.

The Court is required to consider the need for the sentence to reflect the seriousness of the offense. The government talked about this at some length in discussing the purpose behind the statute. There's been some suggestion here in some of the communications that the Court has received that perhaps no actual crime was committed because there was no physical contact. Certainly had there been physical contact we would be talking about a crime of much greater magnitude. But clearly Congress was seeking, in passing this criminal statute, to prevent individuals from, in the midst of using technology, among other things, to entice children. And one thing that's very clear here: This was a child and the defendant was an adult. And the fact that a 13-year old, a 12-year old, the fact that a child of these years voluntarily engages in an exchange with a defendant, a person, and that it ultimately leads to this

kind of behavior doesn't exonerate a defendant, doesn't exonerate Mr. Jeffries from this kind of behavior. The adult is the one that is responsible. The adult is the one that is expected to act responsibly, no matter what the 12- or 13-year-old looks or acts like, no matter whether they're someone familiar or not. And I'm troubled by some of the, some of that suggestion or attitude.

The Court is required to consider a sentence that promotes respect for the law and provides a just punishment, and one that affords adequate deterrence. The reality is that Congress and the President have said that if you're found guilty of this offense, there is a minimum of a 10-year sentence. The guidelines, based upon my ruling, result in a guideline range; that is, 120 months. That is a factor I am to consider. But both the government and the defense have asked the Court to impose that sentence after carefully considering all of these factors.

And I could have simply moved on to the sentencing, but I think it's important that we reflect on this, and frankly, I walk into that courtroom, I have no idea the degree to which family members and/or friends of a defendant who may be sitting here in this courtroom know or don't know the specifics. And while it's an uncomfortable position and not something that I like to do, I read some of the specifics in the presentence report, because I think that it's important that when someone

comes out of their period of incarceration, that the people that love them, that come to support them at the hearing, be able to help hold the person accountable. And to do that, I think it's important that they know the specifics. And so Mr. Jeffries, I don't do that for the scintillating nature of it or for the mere purpose of embarrassing you.

THE DEFENDANT: I understand.

THE COURT: That's not why that's done. I do it to try to make sure that you are held accountable and that you never come back before the court, and that you go on to a productive life after your period of incarceration.

So having carefully considered the advisory guideline range and all these statutory sentencing factors, the Court is now prepared to impose sentence.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Dylan Allen Jeffries, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 120 months, which is the mandatory -- well, it is the minimum -- that's not the mandatory minimum, but it's the minimum sentence, I suppose, that Congress has said the Court can impose. And it's the guideline range sentence, I note also.

Defendant is remanded to the custody of the Marshal to serve the sentence.

Upon release from imprisonment, defendant shall be

placed on supervised release for a term of 10 years.

Within 72 hours of release from custody of the Bureau of Prisons, Mr. Jeffries shall report in person to the probation office in the district to which he is released.

He shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release, and at least two periodic drug tests thereafter, as directed by the probation officer.

While on supervision, the defendant shall not commit another federal, state or local crime, and shall not unlawfully possess a controlled substance, and shall not possess a firearm or a destructive device.

The defendant shall comply with the standard conditions that have been adopted by this court. In addition, the defendant shall participate in a program approved by the probation office for mental health treatment, to include psychosexual evaluation and sex offender treatment, the cost of the programs to be paid by the defendant as directed by the probation officer.

Defendant shall waive all rights of confidentiality regarding sex offender and mental health treatment in order to allow the release of information to the U.S. Probation Office, and authorize communication between the probation officer and the treatment provider so that the probation officer can monitor the defendant's progression and be of assistance in the

probation officer's meetings with the defendant if there are issues during the treatment.

The defendant shall submit to polygraph testing as directed by the probation office as part of his sex offender therapeutic program, the costs of the testing to be paid by the defendant as directed by the probation officer. To the extent he wishes to assert, however, his Fifth Amendment rights against self-incrimination during such testing, he may do so, and that issue may be brought back to the court to determine whether the defendant should be compelled to respond to any of the questions asked during such polygraph testing.

The defendant shall not utilize any sex-related adult telephone services, websites or electronic bulletin boards, and he shall submit any records requested by the probation officer to verify compliance with this condition, including but not limited to credit card bills, telephone bills and cable or satellite television bills.

The defendant shall not have any access to or possess any pornographic material or pictures displaying nudity or any magazines using juvenile models or pictures of juveniles.

I have included in this not just juvenile child pornography, or pornography, but I've also included pornography. The reason for that, that it's broadened, is there is adult pornography here on the images that the defendant was found to be possessing, and the manner in which this case has come to me,

it has come with some suggestion that the defendant was engaged in relationships and/or engaged in chats when he was younger, in his early 20s, that is, with young women who were 17 and/or younger. And to the extent that there's a suggestion that the defendant's involvement in obtaining pornography may have progressed into younger ages, the fact that the defendant continued, had all of this pornography -- as described in the presentence report, quite a bit -- suggests to me that there is a relationship. And so to protect others and to prevent the defendant from in any way spiraling back into this kind of behavior, I'm going to impose this condition.

Defendant shall have no contact with minors unless supervised by a competent, informed adult approved in advance by the probation officer.

Defendant shall not accept any paid or voluntary positions involving children, except those approved in advance by the probation officer.

Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, the defendant shall register with the state sex offender registration agency in any state where he resides, works and attends school, according to federal and state law, and as directed by the probation officer.

Pursuant to that same Act, the defendant shall submit to the search of his person, property, house, residence, vehicle, papers, computer, other electronic communications or

data storage devices or media and effects at any time by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision upon prior notification to and approval by the court, or with a warrant.

The defendant shall not possess or use a computer to access any online computer services at any location, including employment, without the prior approval of the probation officer. This includes any Internet service providers, bulletin board system or any other public or private computer network.

The defendant shall consent to the use of wifi detection devices to allow the probation officer to detect the presence of wireless signals inside or outside his residence.

Defendant shall comply with the requirements of the Computer Monitoring Program as administered by the probation officer and consent to the installation of computer monitoring software on any computer to which he has access.

The probation officer shall perform installation. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence and chat history and conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall also notify others of the existence of the monitoring software and

not remove, tamper with, reverse-engineer, or in any way circumvent the software. Defendant shall pay the costs of the monitoring to the extent he's capable.

During the term of supervision, defendant shall not possess or utilize any video gaming system, console, or any other device which would enable contact and/or the sharing of data with other individuals known or unknown to the defendant.

Defendant shall provide the probation officer access to any requested financial information. If the defendant tests positive for the use of illegal drug or displays signs of alcohol abuse, he shall participate in a program approved by the probation office for substance abuse treatment, which program may include residential treatment and testing to determine whether he's reverted to the use of drugs or alcohol, with partial costs to be paid by him, as directed by the probation officer.

Defendant shall waive all rights of confidentiality regarding substance abuse treatment in order to allow the release of information to the probation office and, authorize communication between the probation officer and the treatment provider.

The Court, having reflected upon the defendant's financial condition, finds that he is not capable of paying a fine. The defendant shall pay a $100 special assessment for the one count to which he pled guilty and he was found guilty. No

restitution is imposed.

Has the Court already entered a forfeiture order?

(Court and courtroom deputy conferred.)

THE COURT: On February 10th, the Court already entered a forfeiture order. I don't need to address that.

The special assessment is due in full immediately. Any balance remaining unpaid on it at the beginning of supervision shall be paid by the defendant in installments of not less than fifty dollars a month until paid in full. These payments shall commence 60 days after supervision begins.

The defendant shall notify the U.S. Attorney for this district within 30 days of any change of name, residence or mailing address until all costs and special assessments imposed by the judgment are fully paid.

Now, Mr. Jeffries, as part of the plea agreement, you waived your right to appeal, with the exception of an ineffective assistance of counsel claim that is reviewable on direct appeal. Generally, waivers of appeal are enforceable. However, if you believe that your waiver is unenforceable, then you may present that issue to the U.S. Court of Appeals for the Fourth Circuit. To do that, you must file a notice of appeal within 14 days from today. If you do not file the notice of appeal on time, you may lose your right to appeal. You have the right to be assisted by an attorney on appeal. One will be appointed for you by the Court if you cannot afford to hire an

attorney. You may be permitted to file the appeal without payment of the costs if you make a written request to do so. Also, if you make a request of the clerk's office, someone there will prepare and file the notice of appeal for you.

Mr. Dorsk, does the defendant wish to be housed as close to -- well, is there any specific request for housing?

(Counsel and defendant conferred.)

MR. DORSK: Your Honor, I suppose closest to this area.

THE COURT: To Hampton Roads, Virginia?

MR. DORSK: Yes, sir.

THE COURT: The Court will recommend that the defendant be housed as close to Hampton Roads, Virginia as possible so that he can have contact with family, friends and significant other.

And Ms. Gratton, do you have a motion?

MS. GRATTON: I do, Your Honor. At this time the government would move that the remaining counts of in the indictment be dismissed.

THE COURT: Without objection, the remaining counts of the indictment are dismissed.

Mr. Dorsk, is there anything else we need to address?

MR. DORSK: No, Your Honor. Thank you.

THE COURT: Ms. Gratton, anything else from your standpoint?

MS. GRATTON: No, Your Honor. Thank you.

THE COURT: Mr. Jeffries, I do wish you well. I hope you will return to the community and be a productive member of the community. And I've tried to put many safeguards in place to make sure that you do that. So I do wish you well, sir.

THE DEFENDANT: Thank you, Your Honor.

(Whereupon, proceedings concluded at 11:21 a.m.)

*CERTIFICATION*

*I certify that the foregoing is a true, complete and correct transcript of the proceedings held in the above-entitled matter.*

Paul L. McManus, OCR

Digitally signed by Paul L. McManus, OCR
DN: cn=Paul L. McManus, OCR, c=US, email=pmcmanusocer@verizon.net
Date: 2017.08.17 11:45:22 -04'00'

Paul L. McManus, RMR, FCRR

______________

Date